The undersigned have reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Kim Cramer. The appealing party has not shown good ground to reconsider the evidence, receive further evidence, rehear the parties or their representatives, or amend the Opinion and Award.
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing before the Deputy Commissioner as:
STIPULATIONS
1. The parties are subject to and bound by the North Carolina Workers' Compensation Act.
2. At all times relevant to these claims, the employee-employer relationship existed between plaintiff and defendant.
3. At all times relevant to these claims, Liberty Mutual Insurance Company was the carrier on the risk.
4. Plaintiff sustained an injury by accident on or about May 6, 1992.
5. The employee's average weekly wage can be determined from a wage chart which was included in the stipulated exhibits.
* * * * * * * * * * *
The Full Commission adopts the findings of fact found by the Deputy Commissioner as follows:
FINDINGS OF FACT
1. The injury by accident of May 6, 1992 was the subject of a Form 21 approved by the Industrial Commission on November 18, 1992. The Form 21 reflects that on that date, plaintiff sustained a low back injury. The Form 21 indicates that the average weekly wage was subject to modification. Based upon the Form 22 wage information submitted by the parties, on May 6, 1992, plaintiff had an average weekly wage of $323.97.
2. Prior to her accident of May 6, 1992, plaintiff had worked for defendant for about 5 years. Her job involved cutting "poly" materials used for cushioning in furniture. She had to lift rolls of this material onto a table. These rolls weighed from three to forty-five pounds. Her accident of May 6, 1992 occurred when she was lifting a roll of poly material onto the table to cut it, and she felt a sharp pain on the right side of her back and her right hip.
3. Following her accident, plaintiff was seen by Dr. Yaussy, a family practitioner, who began seeing her on May 29, 1992. Dr. Yaussy assessed a back strain with low back spasm, and began treatment with medicines, stretching exercises and electro-stimulation. He released her to return to work the next week, with no restrictions.
4. On June 16, 1992, plaintiff began treatment at Carolina Physical Therapy. She had treatments on June 16, 18, 22, and 25. By June 25, she reported to the physical therapy staff that she hadn't had pain or discomfort for the past three days until that day when she did some sweeping, but had no acute pain. The therapist discontinued therapy noting no further treatments were needed at the time.
5. Plaintiff continued to work in her regular job for 40 or more hours per week from May 8, 1992 through the week ending September 4, 1992, with the exception of the week ending June 26, 1992, when she still worked 37 hours.
6. Following the conclusion of her physical therapy, plaintiff did not seek further medical treatment again until September 8, 1992 when she complained to Dr. Yaussy that her back had been hurting since the 4th of July. Dr. Yaussy felt that plaintiff had a work-related thoracic back strain and recommended she work elsewhere in the plant. He returned her to Carolina Physical Therapy, where she continued to be seen into October, 1992. The September 8, 1992 visit was the last time plaintiff saw Dr. Yaussy for her back pain.
7. Pursuant to Dr. Yaussy's directions, around September 14, 1992, plaintiff was changed to a job in the finishing room, where her duties were to wipe the glaze off furniture. This job did not involve heavy lifting, but plaintiff would need to do some stretching and some bending.
8. For the most part, during September and October, 1992, plaintiff continued to report no significant change in her condition to the physical therapy staff. On September 15, 1992 plaintiff reported to the physical therapy staff that she had felt "pain and muscle spasm" in the right thoracolumbar region that afternoon. On September 16, 1992 she reported that she was awakened with pain earlier that morning before going to work. On September 21, 1992 she reported continuous back pain which began as stiffness in the morning and developed into a significant ache by the end of her day.
9. During September 1992 while she was in physical therapy, plaintiff continued to complain of her back pain to her co-workers. Due to her continued complaints, the plant nurse contacted the physical therapy staff and it was decided that plaintiff would be referred to an orthopaedic surgeon for evaluation.
10. On September 25, 1992, plaintiff was first evaluated by Dr. Stanley Peters at Hickory Orthopaedic Center. Her x-rays were normal. Dr. Peters assessed dorsal lumbar strain. He put her on Dolobid, which is both an analgesic and a muscle relaxant, and continued her on physical therapy. He did not take her out of work at that time.
11. Plaintiff alleges a second "injury" occurred on October 1, 1992. On that day she had an acute onset of pain in her back. Plaintiff mentioned a "pop" in her back when she went to physical therapy that day. However, she did not mention any specific incident or accident to her co-workers on that day or to her doctors. Plaintiff was also seen by Dr. Brown of Hickory Orthopaedic that day and did not mention an accident at work that day. Plaintiff had experienced similar onsets of pain on September 15 and 16, 1992 as she reported to physical therapy. The greater weight of the evidence shows that this was not a new "accident" or "specific traumatic incident" but a continuation of plaintiff's prior back pain, which tended to flare up from time to time.
12. Even if this were a new accident, plaintiff did not report it to her employer as required. The first notice the defendant-employer had of any alleged accident on October 1, 1992 was at the hearing before Deputy Commissioner Ballance on April 18, 1994. It appears plaintiff's own attorney had not been told plaintiff claimed that she sustained a second accident at work.
13. The question of whether plaintiff had a second injury is not determinative here in any event, since plaintiff's pain was never fully resolved following her injury by accident of May 6, 1992. Although it diminished during her physical therapy in June, 1992 after she stopped physical therapy, the pain flared up again. Plaintiff went back to Dr. Yaussy with pain complaints on September 8, 1992, which is prior to the date of the alleged second accident.
14. Dr. Brown ordered an MRI of plaintiff's spine and put her on limited duty beginning October 5, 1992. The MRI was normal, and Dr. Peters released plaintiff to return to full duty on October 9, 1992.
15. Plaintiff has continued to complain of pain and has seen numerous physicians. Dr. Brown first assessed fibromyositis, which is also referred to as fibromyalgia, on October 16, 1992. The other physicians have basically agreed with this assessment, although they do not agree on the cause. Dr. Brown's opinion is that plaintiff's fibromyositis was aggravated by her lifting at work.
16. Dr. Peters diagnosed plaintiff with a resolving lumbar strain. He does not diagnose "fibromyalgia," which he finds to be a vague "waste paper basket" term. In his opinion fibromyalgia falls into the realm of rheumatology. Dr. Peters does not think plaintiff's fibromyalgia condition is related to her injury by accident of May, 1992.
17. Dr. Yaussy also noted that fibromyalgia is a nebulous condition, which represents some inflammations of muscles and soft tissues. In the time he treated plaintiff for her back strain, he did not find any history or anything on her exam that supported a diagnosis of fibromyalgia.
18. Plaintiff was seen by Dr. Dennis Payne, a rheumatology specialist, on October 21, 1992. He found no evidence of inflammation or injury to the spinal cord and no evidence of nerve root compression. He diagnosed plaintiff with reactive fibromyalgia. According to Dr. Payne, fibromyalgia is a chronic muscle pain syndrome associated with a non-restorative sleep pattern. This was consistent with plaintiff's complaints that when she awoke in the mornings, she did not feel rested. Dr. Payne did not feel plaintiff was exaggerating her symptoms. Although the etiology of fibromyalgia is unclear, there does appear to be a temporal relationship between trauma and the development of fibromyalgia. It is Dr. Payne's opinion that the accident of May, 1992 could have precipitated or aggravated plaintiff's problem.
19. Dr. Payne took plaintiff out of work beginning November 2, 1992, and then released her to return to light duty on November 17, 1992. A pattern of being out of work or on light duty continued until Dr. Payne took her out of work completely on February 24, 1993, and never released her to return. As of July 2, 1993, Dr. Payne found plaintiff completely disabled from her previous job with defendant.
20. Plaintiff was also evaluated on May 5, 1993 by Dr. Jerry Barron of the Miller Orthopaedic Clinic, whose impression was probable fibromyalgia, although he did not state an opinion on its cause.
21. Plaintiff was referred for an independent medical evaluation to Dr. Robert G. Underdal, an orthopaedic surgeon, whom she saw on May 17, 1993. In relating her history, plaintiff did not mention any accident other than that of May 6, 1992. Many of plaintiff's complaints were subjective and were not verified by the physical examination, in which many of her responses were inappropriate. Plaintiff complained of even slight pressure over many parts of her body. Dr. Underdal found her subjective complaints "far out of proportion to the injury described," and noted this was a classic case of symptom magnification. Although her symptoms were exaggerated, Dr. Underdal did not believe plaintiff was malingering. Rather, he believed her symptom magnification to be an involuntary response stemming from a psychological basis. Dr. Underdal found a large element of depression and underlying psychological problems, which he thought needed further evaluation. He felt the length of time it was taking plaintiff to recover from her injuries might be a factor in her depression. It was his opinion that plaintiff was totally disabled.
22. Plaintiff was evaluated by Dr. Tong-Su Kim, a psychiatrist who first saw her on March 4, 1994. Dr. Kim assessed plaintiff with an adjustment disorder with a depressed mood. It was his opinion that this depressed mood could have originated from her fibromyalgia which then caused pain and fatigue. At the time he evaluated her, Dr. Kim felt plaintiff was unable to work.
23. Although the doctors tend to disagree as to whether fibromyalgia is a descriptive term or a diagnostic condition, the evidence clearly establishes that plaintiff suffers from fibromyalgia, and that this condition is causing her ongoing disability. Fibromyalgia is a condition that is best addressed by a medical expert in the rheumatology field. Therefore, the undersigned gives the testimony of Dr. Payne, the expert in rheumatology greater weight in assessing the cause of plaintiff's condition.
24. Dr. Payne noted the temporal relationship between a trauma and the development of fibromyalgia. Plaintiff was not symptomatic and had no back pain prior to her accident of May 6, 1992. Following her accident and the resulting back strain, plaintiff's pain improved only temporarily. She never completely recovered and by September, 1992 her pain was continuous throughout the day. Plaintiff's injury by accident of May 6, 1992 caused or materially aggravated her fibromyalgia to the point that it became symptomatic and disabling. As a result of her fibromyalgia, plaintiff also developed depression.
25. As a result of her pain from her fibromyalgia, as well as her depression caused by her injury by accident, plaintiff has been unable to work and earn wages in her regular employment or any other employment since February 24, 1993.
* * * * * * * * * * *
Based upon the findings of fact, the Full Commission concludes as follows:
CONCLUSIONS OF LAW
1. On or about May 6, 1992, plaintiff sustained an injury by accident arising out of and in the course of her employment with defendant which resulted in a back strain, and the development of fibromyalgia, as well as depression. N.C.G.S. § 97-2(6).
2. Plaintiff has failed to prove that she sustained a new injury by accident or specific traumatic incident on October 1, 1992. N.C.G.S. § 97-2(6).
3. Plaintiff did not report any alleged injury by accident of October 1, 1992 to her employer as required, such that any claim for such an accident would otherwise be barred. N.C.G.S. § 97-22.
4. As a result of her injury by accident of May 6, 1992, plaintiff has incurred medical expenses for treatment rendered which was reasonably necessary to effect a cure, give relief, or lessen any period of disability. N.C.G.S. § 97-2(19).
5. As a result of her injury by accident, plaintiff has been unable to earn wages in the same or any other employment and has been temporarily totally disabled since February 24, 1992. N.C.G.S. §§ 97-2(9), 97-29.
6. As a result of her injury by accident, plaintiff has developed depression which contributes to her inability to earn wages. Plaintiff still has pain and depression and is entitled to ongoing medical treatment as may reasonably be necessary to effect a cure or give relief or lesson her current period of disability. N.C.G.S. § 97-2(19).
* * * * * * * * * * *
Based on the foregoing findings of fact and conclusions of law, the Full Commission affirms the holding of the Deputy Commissioner and enters the following:
AWARD
1. Defendants shall pay all medical expenses incurred or to be incurred by plaintiff as a result of her injury by accident of May 6, 1992, for treatment rendered which is reasonably necessary to effect a cure, give relief, or lesson any period of disability.
2. Defendants shall pay plaintiff compensation at the rate of $215.99 beginning February 24, 1993 and continuing until further order of the Industrial Commission. The amount that has accrued shall be paid in a lump sum, subject to the attorney's fee.
3. A reasonable attorney's fee of twenty-five percent of the compensation awarded plaintiff herein is approved for plaintiff's counsel. Twenty-five percent of the compensation accrued and due plaintiff shall be deducted therefrom and paid directly to her attorney. Thereafter, every fourth check shall be forwarded to the attorney.
4. Defendants shall pay the costs.
 S/ _____________________ COY M. VANCE COMMISSIONER
CONCURRING:
S/ _____________________ THOMAS J. BOLCH COMMISSIONER
S/ _____________________ DIANNE C. SELLERS COMMISSIONER
CMV/cnp/rst 2/18/97